This court now resumes its session, please be seated. All right, we will now take up argument in the Kia litigation case appeals numbers 247080 and 247185. Thank you, Your Honor, may it please the court. Tim McGrainer on behalf of Appellant Ruth Rubin, I'm going to reserve one minute for  Okay. Thank you. Your Honors, we believe the trial court here erred in approving the settlement and there are two aspects of that that I'd like to focus on today. First the trial court erred when it approved a settlement that it itself concluded provided no value to the… Well, the standard isn't erred, right, it's whether it was a clear abuse of discretion. That's correct, Your Honor. That's important. It is an important distinction, and we do think that the court abused its discretion and erred by approving the settlement below because it approved a settlement that it concluded provided no value to what we are calling the non-theft class. On page 8 of the record, the court makes it very clear that it reached that conclusion. Now, I think what you will hear from the other side is that, no, no, no, they were getting value. There was some value provided to those folks, but the trial court didn't find that. But there clearly was some value. That's not what the trial court found, Your Honor. On page 8 of the record, the court made very clear that contrary to plaintiff's assertion and is discussed more fully below, the law firm, my firm, correctly points out that the with compensation for increased insurance premiums or their vehicles diminished. Right. Well, that's true, but that's no value. That doesn't mean that they didn't get other value. That's not what the court found, though, Your Honor. No, no. It said it found that just as to insurance premiums and diminishing value. Correct. Which is the only one. And it explained why. Which is the only harm that the non-theft members have suffered in this case. So let's put the two classes together. But you just made a flat misrepresentation of what the district court said. It said there was no value, it said there was no compensation for those two things. That's correct, Your Honor. And those are the only two things that my clients have been harmed by in this case. My client has been harmed by in this case. The only harm that she suffered. They both have been harmed in the sense that they face a risk of theft. Correct. And they receive something for that, right? I mean, they get the software upgrade or if that doesn't work, they get the money to buy the third-party anti-theft system. So they're getting something, right? And those are not harms that are, or those are not remedies that are provided by the  Let me make that clear. The trial court settlement here was not a settlement that provided the software solution. The software solution was something that the defendants have already agreed to do prior to the settlement being reached. Up to a point, I thought they stopped doing it in December 24. Correct. And there's no reasonable likelihood that they would ever have stopped doing that because they've done that out of their own business judgment. And this court's decision in Coby found that a voluntary remedy by the defendants that they provide with, absent the settlement, is not value that can be used to support the settlement itself. So that is not a valuable remedy that anybody is being provided by the settlement. So the settlement, and I don't know whether this was provided before, provided something about the steering column or the ignition switch, some other things. To protect against future. Right. Yes, that's correct. Right. So that's another piece of compensation that was not provided before. That was also, I believe, provided not as part of the settlement. That was, again, something that was... It was part of the settlement. Pardon? I thought it was part of the settlement. No, I don't believe so, Your Honor. It was something about breaking glass, so that's correct. Right. I think that remedy, the piece on the column that you're referring to, I think that was also part of... There was some money for child care or something, time spent getting the fix done. Correct. And we don't view that as compensation. That's just to help people get the fix that they are already offering. So if I take time off work to fix my car because of the defense... That was part of the settlement. That was part of the settlement, Your Honor. Right. So they didn't get nothing. Let's just start with they didn't get nothing. I do not believe that compensation in that form is substantial compensation to provide to the clients that are not getting monetary relief in this case. The other aspect that I think should be very troubling to this Court is that the District Court abused its discretion by allowing the settlement to proceed with no discovery having been done. So let's talk through the timeline on that. The settlement here was reached just one month after the Consumer Consolidated Amended Complaint was filed. One month. There was no discovery done at the time that the clients reached their settlement, the plaintiffs reached their settlement, and there was no discovery done at that time. They didn't serve any discovery until they reached the settlement for the defendants, with the defendants. So the only discovery that they did here was designed to buttress the settlement that they reached. It was not done in order to evaluate the strengths of the claims that they had made in their complaint just one month prior to reaching the settlement. And in that complaint, they have multiple allegations as to why insurance premiums are compensable harm, why the diminution in value is compensable harm, and just one month later they completely abandoned those claims with no discovery having been done. The plaintiffs took more discovery of my client in this case than they took of the defendants. There were multiple depositions taken of my client and her expert. We produced thousands of pages of documents. There were only 1,250 pages produced by the defendants in the confirmatory discovery. There were two expert reports they submitted in response to my client's objection. They did none for the plaintiffs. I see that I have one minute left, so I want to reserve a little bit of time for rebuttal. But if the court has more questions, I'm happy to answer them. You've got a minute for rebuttal. Thank you, Your Honor. Good morning. Good morning. My name's Donald Berner. I'm a class member and one of the two objectors. Rather lonely position, frankly. The reason I'm here today is the 38 page order that I've appealed makes almost no mention of the misconduct of this defendant for over a decade. According to the brief filed by defense counsel, there are 25 million class members, which indicates that that's a plus or minus 25 million vehicles that had no theft prevention recognized by law. And they did that for a decade until it was discovered by the Kia boys. And there was flagrant thefts, injuries, and fatalities. So the reason I'm here today, for the most part, is they knew as manufacturer of these vehicles, they're experts in the operation and mode of these vehicles. And they know that when vehicles are stolen, that often results in personal injury, fatalities. The first thing a person does when they see if they come upon the scene, I wanna protect my property rights, and they intercede. According to the FBI, 80% of these thieves are weaponized. So this company knew that they were putting, for a decade, day after day after day, sale after sale after sale, in great jeopardy. And that's why I'm here today, on my own dime from Jacksonville, Florida. And I wanted to make that point. The second point that I wanna make is there was no loss of bargain in this judgment. I raised it very prominently in two briefs that they didn't get what they bargained for, which was a safe car that met theft prevention standards. The judge said, and there was nothing in it, and I thought that he overlooked that issue, even though he awarded loss of value, or loss of bargain, in an earlier case, the unintended acceleration case. I thought maybe he just overlooked it, so I filed a motion to reconsider. I thought about it for a period of time, and I thought, well, it's only fair to give him the opportunity to address that issue, right? So I filed a motion for reconsideration. He said, I never brought up that issue in my pleadings, which I did, in two different docket numbers. In fact, one, I remember specifically because it was thrown out, because I didn't flatten the envelope. Apparently, when you don't flatten the envelope, nobody can open up the file. So I refiled that one, so I knew there were two that I argued this very issue. And the reason this issue is important is it's the one issue that would compensate every single person that bought one of these cars unknowingly without theft prevention. And that was- But why isn't the- Pardon? Why isn't the valuation issue that Ms. Rubin raised essentially the same issue? I'm sorry, I didn't catch that. My hearing- Why isn't the valuation issue, the decrease in value issue, essentially a proxy for the loss of bargain question? I see. Well, because the loss of bargain occurs at the time of sale. Well, I understand that, but how do you measure it? Well, you measure it in a couple different ways. You could, I'm not into damages exactly, but you could measure it in what would it do- It has to be market value, right? Okay, well, let's say you could measure in what does it cost to bring the product into the bargain, okay? With theft prevention that it should have had. So maybe that's $100, okay? That would be one way of quantifying it by saying, what would it cost to make it right? Very, very precise, have experts testify to that. That'd be one very clear way of doing it, and I would suggest that. And I hope that answers your question. Okay. But going on, just to show you the, and the software patch was devised way before this settlement occurred. If you look at the timeline, I don't have time to go through that. But that was done, it had nothing to do with the settlement. They said it was the most important part of the settlement, but it was born out of necessity when their cars were being stolen in droves. They had to come up with this software patch, and it's just a patch. It doesn't meet standards yet, but they had to come up with that. And one of the reasons it doesn't meet standards yet is because it's not passive. It's not self-arming. They have to arm it with, the owner has to arm it with his key fob as he walks away from the car, hopes he hears the beep beep, or hopes he remembers that he hit the thing, otherwise it doesn't work. But that's aside from the point that wasn't part of the agreement. That was agreed to well before the settlement agreement was concerned. But they did say, Defense Council did say at a hearing on July 15th that that's our primary concern, what we accomplished. And that was in vogue way before the settlement. It was the NCHA proclaimed that several months before. So the software was bootstrapped into the agreement. And this court has ruled that when there was a agreement that was formed separate and apart from the settlement agreement, it couldn't be taken into account. And the other thing they did is they blame it on the criminal. And I've got 43 seconds. The criminal shouldn't have stolen these cars. I'll allow you some rebuttal time if it's necessary. The time's 33 seconds. Right, you can finish your point. Finish my point? Yes, and then I'll let you have some rebuttal time. Okay. I guess the point is too is the audacity of it. And in the United States, in order to put a car into the stream of commerce, you have to certify the emblem, you have to put it on the car itself. That it meets all theft prevention standards and all safety standards. And there's a, this is an example of one I wanted to blow it up and I wasn't able to do that. So they put this label. They certified as meeting the theft prevention standards and it doesn't. And they did it probably 25 million times, stuck this on there and said it did. And I think that's abysmal. How do they do that? Well, apparently they figure if we get caught we just, we have some type of defense and we go with it. And they make money off this. And I'm gonna leave it at that. People say, well, they only made $50, or $100 saved. But that's not true. These things are patented, all right? They're patented, and they have to buy the technology. And there's royalties depending on how many cars you process. So by and large, it becomes oftentimes as much as the parts of labor buying the technology, and that's what they didn't want to do. And the other thing they gained an advantage over are their competitors that put this on their cars and bought the technology. And that's why I'm here today, because it wasn't right. The agreement doesn't address the main things. In fact, it rewards them. For example, they take a 40% off the top of all damages before they even start figuring a low ball figure. They appropriate the insurance of class members, which one court called repugnant. So in other words, if I've got comprehensive, my car's stolen, they use my insurance that I paid the premiums on to offset their liability. And that doesn't seem right. I don't remember Kia ever saying, Donald K. Berner, we'd like to pay your premiums. Well, that other case is about the insurance. The other case is about the insurance company suing them to get their money back, that they paid their insurance. Yeah, so the other, well, it's certainly been streamlined, the process did it. Okay, well, thank you.  I appreciate your patience. Thank you so much. Good morning, Your Honors. May it please the panel. My name is Sean Mapp, representing the Pauley Class Council. I've agreed with my colleague for Hyundai Kia to split our time. I'll take seven minutes. I'm gonna respond first to this notion that the fix is somehow an illusory benefit of the settlement, that is not true. Yes, the fix was announced before the class settlement actually occurred. And the case hadn't been filed yet either, or had it been filed? It had been. In fact, the case was filed almost two years before the fix was announced. So I think we can make some inferences about, you know, what was a catalyst there. But more importantly, I think under this court's case law, is absent a judicially enforceable agreement, Hyundai Kia could have withdrawn from offering the software upgrade at any time. And in Lane versus Facebook, this case, this court made quite clear. But it actually did withdraw at one point. Well, it has a limitation on when you have to have it done by. Okay, and that was another thing, another benefit of the settlement ad was it extended by a number of months, the availability of that upgrade. But in Lane versus Facebook, this court said a judicially enforceable agreement to do something or not do something is valuable consideration. So I want to ask you about Ms. Rubin's objection about the insurance increases. That was really the only part of this that I was concerned about at all. I mean, the record does show, and there was not much discussion of this on your part or on Hyundai's part, that there were applications for rate increases made in several states specifically for this reason. Which is at least some indication that insurance companies were increasing the rates for this reason, as you would think they would. The problem, Your Honor, is the record demonstrated that there's no one put any evidence, reliable evidence in the record. What that evidence was in the record. Right, right, but no one put any reliable evidence in the record. That's reliable. What's not reliable about it? Right, correct. But stating what the actual increase in insurance rates would be in any given situation. Well, but is that the obligation at this point? The obligation, presumably, was yours to do that investigation and figure out whether there was something viable. And you're supposed to be demonstrating that this is a fair and reasonable settlement. The objector, as I understand it, has to raise some evidence to just show that there's a viable problem here. But not to prove up that there was, in fact, an ascertainable amount of increase. That's the merits question, and it's the question that, presumably, the class counsel should have looked into as a predicate to negotiations. So we did look into it, Your Honor, and you have anecdotal evidence that some premiums may have gone up. You have anecdotal evidence, I would say more than anecdotal, in the form of a survey by Insurify that said that they didn't go up materially for these cars. I thought it said they did go up, but other ones went up too. It said, it did two things. But we know, we know that some of the insurance companies were applying for increases for this reason. But we also know that some insurance companies were not. And, again, I think it's incumbent to show that you can solve this problem using class-wide evidence. And no one has done that here. In fact, Plaintiff's submitted an expert declaration that's in the record showing that you really can't do it because there are so many different factors that go into setting premiums. Even the expert, Mr. Burreel. But you did do it with regard to the SEF class. I'm sorry? You did do it with regard to the SEF class. The SEF class did get relief for insurance increases. That was if they could demonstrate specifically their insurance premium went up after they had a theft event. Okay. Okay. But I want to come back to this notion. But you'd have the same problem there, presumably. They couldn't, they'd have to show why it went up. You would. In fact, Ms. Rubin couldn't even demonstrate what percentage of her premium that did increase was a result of the theft of her car. This type of wrong. And the reason is because even Ms. Rubin's expert, Mr. Burreel, admitted that there were different factors driving the increased insurance rates during this time period. You had general inflation. You had an increase in car repair costs. You had a surge in traffic fatalities. An increase in thefts of all cars. So the problem is being able to show, using reliable evidence, that you can actually get at this problem on a class-wide basis. And no one did that. We couldn't do it. And indeed, the expert that we retained said you can't do it. So I think there was no burden shifting here. That we have shown that the settlement as a whole is fair. You have to take it as a whole. And there were other problems with Mr. Burreel's expert submissions. I won't belabor that because I want to, if I may, bring us back to kind of the big picture here. Which is, in order this court's jurisprudence, we have to take a hard look at the settlement. And the review goes into the process and it goes into substance. And the process part of it is really important because this court's review of a substantive fairness determination is very narrow, right? With the court rarely overturning settlements for substantive reasons. And generally, only when the settlement contains convincing indications that self-interest rather than the class's interests, in fact, influence the outcome. That's from the California pizza decision earlier this year. So given these substantive limitations, this court holds a district court to a very stringent procedural standard. And that process inquiry reviews whether the district court comprehensively evaluated the fairness factors under Rule 23E2. And this court's decisions in Bluetooth, Churchill, and Hanlon. And we submit respectfully that district court's inquiry here was a model of careful scrutiny and attention to the interests of all class members. When first presented with the preliminary approval motion, the court had some misgivings and asked the parties to improve the settlement in specific ways. And the party did so. The district court then required and reviewed relevant expert testimony on the fix and also the various damages issues. So we had expert testimony come in from a mechanical engineer reporting on the fix. It had no rebuttal. We had expert testimony coming in on the damages and the overall damages and what recovery would be for class members. It had no rebuttal. We had an expert provide expert testimony on the fact that there was no diminished value that could be demonstrated during the class period. It had no rebuttal. And then we had the insurance experts we just discussed. So all told, the district court reviewed this settlement for over 16 months, held four hearings, had multiple rounds of briefing, issued eight opinions and orders totaling 159 pages, and in doing so made all those findings that this court requires. No findings of no collusion under the Bluetooth factors and then findings under Rule 23E2 and Hanlon slash Churchill. And importantly, in its final approval opinion, the district court carefully considered all the objections and provided a reasonable response to those objections as required by this court and Dennis v. Hanlon. So I think the substantive inquiry that follows the process inquiry also demonstrates that this settlement was more than fair and adequate. But I will yield the rest of my time to my colleague as I promised. Thank you. Okay, thank you very much. Thank you, Your Honor, and may it please the court. Chris Mischel for Defendants Appellees Hyundai and Kia. The settlement at issue in this case released novel and uncertain legal claims in return for real and meaningful benefits for the whole class focused on the class members who need them most. The district court scrutinized the settlement with exceptional care and did not come close to abusing its discretion and granting approval. I'll start with one of the issues that came up in the settlement. The top side of the argument, which is what benefits do members of the class who did not suffer a theft. Okay, I'm simply reinforced that there are numerous of those benefits that they included ones that were not being provided before the settlement was in place. They include $300 for the glass break alarms that Your Honor referred to. They include benefits for incidental costs to make the software upgrade more valuable. They include a lifetime guarantee on the software upgrade, which is a significant benefit that was not offered before that. So all of those are benefits that those class members received. Now, it's certainly true that the class members who received the greatest benefits are the class members who suffered the greatest harms, those who had thefts or theft attempts on their vehicles. But that we respectfully submit is a feature rather than a bug of the settlement. It indicates that the parties agreed to allocate relief to the class members who had been injured the most, who needed the relief the most, and who had the strongest claims at the end of the day. I think it's also important to recognize that one of the 23E factors, as well as the Hanlon factors, require the district court to look at the strength of the claims on the merits. And this claim for the insurance premiums, Judge Berzon, that you referenced, I think is just a very difficult claim on the merits to ultimately substantiate. The plaintiff's position for that would be that the automaker is liable for insurance premiums that are caused by third-party thefts of other vehicles, but not actually the plaintiff's vehicle. And that's at least two or three steps removed from the defendant. There'd be very serious problems of causation and duty in ever trying to prove up those claims. So instead, the parties did what this court has said parties are encouraged to do, which is they found a settlement where there's meaningful relief given to those class members. I do think the district court carefully considered the insurance premium claims. My friend said that he shifted the burden. But in fact, the district court expressly said that the burden lies with the plaintiffs to prove that the settlement is fair. There's no procedural requirement that there be a sort of mini-trial or battle of the experts on each subsidiary claim that an objector might be able to bring. Instead, as this court has said repeatedly, the settlement is reviewed as a whole. But the objector doesn't have to prove up a case. No, the objector doesn't have to prove the case. That's for sure. But ultimately, the district court has to make a holistic determination of whether the settlement is fair to the class as a whole. And this court reviews for abuse of discretion. And I think with respect, Judge Selma's decision was a model of discretion and of careful scrutiny of the settlement, including on this insurance premium point. He did note that there was strong evidence on the other side. The Insurify report that I believe my colleague mentioned, the car and driver report, showed that premiums had increased across the board. And there was just no, the expert report or purported expert analysis submitted by Ms. Rubin, you know, simply couldn't establish that there was any kind of causation. I'm not saying she had to prove the case. But she had to produce something that had some credible value in order to, you know, support her claim. And she just failed to do that. I think another way to see that is that, as we pointed out in her brief, in our brief, you know, she submitted a range of estimates that went from $35 million to $900 million, which she said were the value of the insurance premiums. I think that shows, you know, that massive range that there's really not any rigorous analysis undergoing, underlying her position. And I'd finally say, although I don't think you need to reach this, even if, you know, you were inclined to think that the district court should have given those claims more credit than it did, the district court still did not err in accepting the settlement overall. After all, as this court has said over and over again, in canonical decisions like the officer's case from 1982, and the class plaintiffs versus Seattle in 1992, and more recent decisions like Apple, there's no obligation for every possible claim in a class to receive compensation. The nature of a class action settlement is compromise. And so even if these sort of secondary, attenuated insurance premium claims should have been given more credit than they were, it was still well within the court's discretion to uphold the settlement as a whole. Unless the court has further questions, we respectfully ask that you affirm. All right. Thank you, counsel. Okay. Mr. McRainer? Yes, Your Honor. Thank you. I'd like to address the last point here that counsel was discussing, and that is that my client didn't present sufficient proof for the district court. I think the error here below is my client doesn't have access to discovery. My client is not a party to the case. My client is not the one who can go out and obtain information from all 50 state insurance agencies, which is what the trial court suggested ought to have been done here. My client is not the one who has the ability to go investigate, serve subpoenas, serve discovery requests on the insurers themselves. That was the job of plaintiff's counsel. And plaintiff's counsel, in their complaint just one month before this, had other evidence that they had cited in their complaint. And I'm talking about paragraphs 1431 to 1444 of their complaint. They have quotes from farmers insurance. They have quotes from progressive, the insurers themselves, that they were raising rates because of this defect. The trial court didn't give that any weight whatsoever, and that was error and should be reversed. We ask that this court reverse the trial court's decision approving the settlement and remand for further proceedings. All right. Thank you, counsel. Mr. Berner? Mr. Berner, did you have something to add? One of the things that troubled me about the court's order is it accepted their expert stocking at Faisalio. And if you look at his opinion or his report, he plugged in figures with no verification to reach a payout of $148 million. He admitted that 80% of the cars on the road today have comprehensive so that they would have insurance and not fall within the uninsured category where people got more money. Then he proceeded to assume everybody didn't have insurance in his opinion. And that got through the court somehow, and it was totally ridiculous. And in fact, I even asked myself, is there a mathematical equation where you could take a figure and work backwards? So I put in AI, and there is. And that's what he apparently did. So that report meant nothing. And the judge, as a fiduciary, and I'll do respect to him, could have hired his own expert to rebut it or get more information to put it on my shoulders or the counsel's client that wasn't realistic. As far as the only real modicum of compensation was the people that had their car stolen that didn't have insurance. And the right reason, they say, is they were more needy. But there's an old adage, men do things for the right reason. And the real reason, the real reason is those cars weren't worth much. That's why they weren't insured. Thank you. All right. Thank you, counsel. In re Kia Hyundai vehicle theft marketing appeals, number 24, 70, 80 and 24, 71, 85 are submitted. And this court, this session of this court is adjourned for today. Thank you. All rise. This court for this session stands adjourned.
judges: WARDLAW, BERZON and MILLER